IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

————————————

No. 13-4537

————————————

UNITED STATES OF AMERICA,

*Plaintiff - Appellee,*

v.

CHARLOTTE ELIZABETH GARNES,
a/k/a Charlotte Elizabeth Carter,

*Defendant - Appellant.*

————————————

Appeal from the United States District Court
for the Western District of North Carolina

*The Honorable Frank D. Whitney, Chief Judge*

————————————

BRIEF OF THE UNITED STATES

————————————

Anne M. Tompkins                William M. Miller
United States Attorney          Assistant United States Attorney
                                227 West Trade Street
                                Carillon Building, Suite 1650
                                Charlotte, North Carolina   28202
                                (704) 344-6222

*Attorneys for the United States of America*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES  ................................................................iii

JURISDICTIONAL STATEMENT ........................................... 1

ISSUES PRESENTED ................................................................. 1

STATEMENT OF THE CASE  .................................................. 2

SUMMARY OF THE ARGUMENT ........................................ 20

ARGUMENT

    I.   The district court did not plainly err during the cross-examination of Garnes by allowing the Government to ask limited follow-up questions about a past romantic relationship to rebut Garnes's characterization of her prior termination ................................... 23

        A.   Standard of Review ..................................................... 23

        B.   Discussion.................................................................... 24

    II.  There was sufficient evidence from which a rational trier of fact could find each element of Garnes's various counts of conviction beyond a reasonable doubt. ....................................................... 28

        A.   Standard of Review ..................................................... 28

        B.   Discussion.................................................................... 29

    III. The district court acted within its discretion by ordering Garnes to pay restitution that included amounts related to fraudulent claims submitted by her co-conspirator.................. 41

        A.   Standard of Review ..................................................... 41

B.      Discussion......................................................................41

CONCLUSION  ......................................................................43

REQUEST FOR DECISION ON THE BRIEFS WITHOUT
ORAL ARGUMENT ..............................................................43

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Cases

*Jackson v. Virginia*, 443 U.S. 307 (1979).................................................28

*United States v. Ambers*, 85 F.3d 173 (4th Cir. 1996) ............................26

*United States v. Beverly*, 284 Fed. App'x 36 (4th Cir. 2008) ................30

*United States v. Brooks*, 111 F.3d 365 (4th Cir. 1997) ..........................38

*United States v. Burgos*, 94 F.3d 849(4th Cir. 1996) ......................30, 35

*United States v. Cloud*, 680 F3d 396 (4th Cir. 2012)..............................27

*United States v. Davis*, 490 F.3d 541 (6th Cir. 2007) ............................30

*United States v. Day*, 700 F.3d 713 (4th Cir. 2012)................................23

*United States v. Dinkins*, 691 F.3d 358 (4th Cir. 2012) ..................28, 37

*United States v. Hassan*, ___ F.3d ___ , 2014 WL 406768
  (4th Cir. 2014) .............................................................................25

*United States v. Hughes*, 484 Fed. App'x 766 (4th Cir. 2012) ...............41

*United States v. Leftwich*, 628 F.3d 665 (4th Cir. 2010) .......................41

*United States v. McIver*, 470 F.3d 550 (4th Cir. 2006) ..........................34

*United States v. McLean*, 715 F.3d 129 (4th Cir. 2013) ........................35

*United States v. Meredith*, 824 F.2d 1418 (4th Cir. 1987)....................30

*United States v. Murdock*, 290 U.S. 389 (1933).....................................37

*United States v. Newsome*, 322 F.3d 328 (4th Cir. 2003) ......................41

*United States v. Njoku*, 737 F.3d 55 (5th Cir. 2013) ..............................29

iii

*United States v. Olano*, 507 U.S. 725 (1993) ............................................ 24

*United States v. Osuji*, 413 Fed. App'x 603 (4th Cir. 2011).................... 29

*United States v. Pratt*, 239 F.3d 640 (4th Cir. 2001) ............................... 23

*United States v. Reich*, 479 F.3d 179 (2d Cir. 2007)............................... 38

*United States v. Roe*, 606 F.3d 180 (4th Cir. 2010) ................................. 28

*United States v. Smith*, 451 F.3d 209 (4th Cir. 2006) ............................. 25

*United States v. Tucker*, 376 F.3d 236 (4th Cir. 2004) ........................... 30

*United States v. Wilson*, 973 F.2d 577 (7th Cir. 1992) ............................ 23

*United States v. Zayyad*, 741 F.3d 452 (4th Cir. 2014) .............. 23, 28, 30

Statutes

18 U.S.C. § 1035 ........................................................................................ 13

18 U.S.C. § 1035(a) .................................................................................... 35

18 U.S.C. § 1347 ........................................................................................ 29

18 U.S.C. § 1349 ........................................................................................ 13

18 U.S.C. § 1512(c)(2) .......................................................................... 13, 37

18 U.S.C. § 1515(a)(1)................................................................................ 38

18 U.S.C. § 3231 .......................................................................................... 1

18 U.S.C. § 3663A(a)(1) ............................................................................. 41

28 U.S.C. § 1291 .......................................................................................... 1

Rules

Fed. R. Evid. 608(b) .................................................................25

## JURISDICTIONAL STATEMENT

Defendant Charlotte Elizabeth Garnes appeals following her conviction for conspiracy to commit health care fraud, obstruction of an official proceeding, and making false statements related to health care benefits.   The district court entered judgment on July 15, 2013, J.A. 1078–84, and Garnes filed a timely notice of appeal the next day, J.A. 1085–86.   The district court's subject matter jurisdiction derived from 18 U.S.C. § 3231.   This Court's jurisdiction to review Miller's appeal is premised on 28 U.S.C. § 1291.

## ISSUES PRESENTED

I. Whether the district court plainly erred by permitting limited questions regarding a past romantic relationship between Garnes and an individual with whom she worked as a follow-up to the Government's cross examination about Garnes's termination from a prior job for failing to maintain required documentation.

II. Whether there was sufficient evidence to support Garnes's convictions for (1) conspiracy to commit health care fraud;

(2) making a false statement related to a health care benefit program, and aiding and abetting the same; and (3) obstruction of an official proceeding.

III. Whether the district court acted within its discretion by ordering Garnes to pay restitution based on amounts fraudulently billed by Garnes's friend and co-conspirator, where Garnes suggested the relationship that led to the fraudulent billing and regularly corresponded with her friend regarding the claims.

## STATEMENT OF THE CASE

1. Garnes submits hundreds of thousands of dollars' worth of fraudulent claims to Medicaid for services she did not provide.

From February 2009 through April 2011, Defendant Charlotte Elizabeth Garnes submitted more than $650,000 in claims to the North Carolina Medicaid agency for outpatient behavioral health services that she did not provide.   J.A. 490.   In connection with each of the claims, Garnes reported that she was the attending provider who performed the services.   J.A. 464–65.   Contrary to Garnes's representations, the services, if provided at all, were performed by unlicensed counselors allegedly working under Garnes's supervision.   J.A. 490, 574–75.

2

Records confirm, however, that many of the claims were outright fabrications.   J.A. 494–501, 593–617, 637–58.   Garnes profited from the scheme by dividing the proceeds from the false claims with the unlicensed counselors.   J.A. 158, 568, 572.

Medicaid is a joint federal and state program that provides medical services to low-income individuals.   J.A. 63–64.   In North Carolina, the Department of Health and Human Services, Division of Medical Assistance ("Medicaid") administers the program and establishes the minimum qualifications for providers.   J.A. 66–67.   According to Medicaid requirements, providers of outpatient behavioral health services must have a master's degree from an accredited university and be licensed in an approved field.   J.A. 66, 89.   Even then, licensed therapists must apply to become enrolled as Medicaid providers.   J.A. 67.   After verifying applicants' credentials, Medicaid issues qualified providers a Medicaid provider number, which enables them to seek reimbursement for the services they provide to Medicaid patients.   J.A. 68, 70, 73–74.

3

After successfully enrolling as a Medicaid provider of outpatient behavioral health services, Garnes obtained Medicaid provider numbers for herself and her business, Charlotte's Insight.   J.A. 133–36, 156.   As early as February 2009, Garnes began using her Medicaid provider numbers to submit claims to Medicaid for services she did not provide. J.A. 490.   The claims Garnes submitted were based on services purportedly provided by a pair of unlicensed counselors, Teresa Marible and Sylvia Jackson.[1]   J.A. 490, 574–75.   Because Marible and Jackson were not licensed or enrolled, they were not qualified to provide services to Medicaid patients and were not entitled to seek reimbursement from Medicaid.   J.A. 68–69, 74, 116.   Nevertheless, Garnes submitted claims on behalf of Marible and Jackson, indicating that she was the attending clinician who provided the services.   J.A. 464–65.

In an attempt to justify the false claims, Garnes asserted that Marible and Jackson were provisionally-licensed counselors working under her supervision.   J.A. 764–65, 783–84.   Medicaid requirements

---

[1]Sylvia Jackson's real name is Michele Jackson.   J.A. 273.   In addition to billing claims on behalf of Jackson, Garnes engaged Michele Jackson to provide third-party billing services for a brief period of time. J.A. 591–92

4

prohibit an enrolled provider from submitting claims based on the supervision of a provisionally licensed individual, however, unless the supervising provider is a physician.   J.A. 101–09.   Accordingly, a licensed professional counselor like Garnes could not lawfully submit claims for services provided by others, like Marible and Jackson, even if they were provisionally licensed and working under Garnes's supervision.   J.A. 109.

Even if Garnes had been permitted to submit claims on behalf of provisional licensees under her supervision, Marible and Jackson were not, in fact, licensed and Garnes failed to satisfy the "strict" rules governing supervision arrangements established by the North Carolina Board of Licensed Professional Counselors ("LPC board").   J.A. 157, 161, 237–38, 409, 426, 432–34, 575.   Specifically, Garnes did not file a supervision contract with the LPC board, failed to supervise Marible and Jackson for one hour for every forty hours they worked or meet with them "face to face," and did not submit quarterly reports to the LPC board describing the supervision.   J.A. 426, 430–32.   In fact, for many of the dates Garnes supposedly supervised Marible and Jackson, Garnes

5

was travelling and was not available to provide services or supervision. J.A. 503–07.   For example, for one week in July 2009, Garnes submitted claims on behalf of Marible and Jackson totaling more than $16,000 for a period of time when she was in Minnesota.   J.A. 505.   Similarly, for a two-week period in 2010, Garnes submitted a total of $17,840.44 in Marible and Jackson claims for a period of time when she was abroad in Italy.   J.A. 507.

Even though she was prohibited from billing for services provided by others, Garnes continued to submit claims on behalf of Marible and Jackson from 2009 through 2011.   J.A. 490.   Under the billing arrangement Garnes established with Marible and Jackson, the unlicensed counselors emailed their claims to Garnes and her "third-party biller," Joanna Patronis, who in turn submitted the claims, listing Garnes as the provider of the services, to Medicaid for reimbursement.   J.A. 132, 242–62, 514, 536–38.   The proceeds from the claims were then deposited into Garnes's bank account.   J.A. 625.   In exchange for making her provider number available to Marible and Jackson, Garnes took a 30% cut of the Medicaid reimbursements before

passing along the remainder to Marible and Jackson.   J.A. 627–30, 1093.

In addition to the actual claims data, the emails between Garnes, Marible, Jackson, and Patronis also contained a discussion of the group's billing practices.   J.A. 242–62, 514, 536–38.   For example, in one email, Garnes explained how best to document the claims, instructing Garnes to avoid giving all patients the same score and to "mix up the dates on the termination forms."   J.A. 665.   In another email related to the volume of claims, Garnes instructed Patronis to enter Marible's claims promptly because Marible "has a lot for you."   J.A. 514–15.   Similarly, in a later exchange, Marible wrote to Garnes and Patronis, "I have sent six pages of billing. . . .   Charlotte have a safe trip.   I/we will miss you but the billing must go on because my children has [sic] to eat."   J.A. 534.

From February 2009 through April 2011, Garnes billed Medicaid $665,062.75 in claims received from Marible and Jackson, representing 90% of all claims submitted by Garnes to Medicaid during this period. J.A. 490, 492–93.   In 2009 and 2010, Medicaid reimbursements were

7

Garnes's largest source of income, during which time she purchased a Mercedes, vacationed in Italy and Jamaica, and invested more than $20,000 in a beauty salon.   J.A. 627, 801, 870–71.

In addition to the claims submitted by Garnes, at Garnes's suggestion, one of her friends, Oriaku Hampton-Sowell, also submitted claims to Medicaid on behalf of Marible.   J.A. 878, 1091, 1094.   During this period of "joint supervision," Hampton-Sowell submitted $150,000 in claims for Marible, in addition to the claims that Garnes continued to submit for Marible using her Medicaid provider numbers.   J.A. 781, 1094; Supp. J.A. 9–17.   In total, Garnes and Hampton-Sowell received $792,814.52 in reimbursements from Medicaid for services they did not provide.   J.A. 1096.

2.   <u>The claims data and clinical notes show that many of the claims listing Garnes as the attending provider were fabricated.</u>

The claims data emailed to Garnes and Patronis demonstrates that, not only did Garnes not perform the services for which she claimed reimbursement but, in fact, no one did.   Many of the claims provided by Marible and Jackson to Garnes and Patronis claimed reimbursement for more than eighteen hours of therapy services per day.   J.A. 494–501.

8

In fact, dozens of the claims billed for more than twenty-four hours of therapy per day, including one Sunday seeking reimbursement for sixty-nine hours of therapy.   J.A. 501, 1093.   In addition to the incredible hours, in several of the emails to Patronis and Garnes, Marible submitted the exact same list of claims on multiple occasions. J.A. 226–29, 326–28.   A review of the claims data submitted by Marible and Jackson to Garnes and Patronis, therefore, reveals that many of the claims were invalid on their face.   J.A. 507–08.

In addition to the claims data, the supporting documentation and clinical notes confirm that Garnes submitted claims for services that were never provided.   In violation of Medicaid policy, Garnes did not maintain patient files for most of the patients covered by Marible and Jackson's claims.   J.A. 82–83, 90–91, 634.   In the files that did exist, the same narrative descriptions were provided for patients across multiple therapy sessions, "the only thing that would change would be the date of service."   J.A. 637–58.   Not only did the same cloned notes appear on different days in a single patient's file, but the same narrative

9

description was also copied and pasted "across different recipients." J.A. 637.

Other notes contained descriptions that were inconsistent with the patient's age and gender.   J.A. 191–93, 210, 223–24.   For example, several of the notes for therapy sessions with children discussed the patient's "ability to hold regular employment."   J.A. 226.   Other times, the notes described symptoms that did not apply to the particular patient.   J.A. 205–06, 224–26.   Finally, many of the claims submitted by Garnes on behalf of Marible and Jackson covered Medicaid patients, including children, who never received any outpatient behavioral health services and who never met Garnes, Marible, or Jackson.   J.A. 187–93, 197–99, 203–04, 219–23, 233–34, 520–35, 539–45, 593–617.

   3.   <u>Garnes lies to investigators during the course of a grand jury investigation into Medicaid billing practices.</u>

In the fall of 2010, a federal grand jury initiated an investigation into Patronis's Medicaid billing practices by issuing subpoenas for documents and testimony.   J.A. 562.   In November 2010, Patronis emailed Garnes to notify her of the investigation, stating that she could "no longer do [Garnes's] billing" in light of the investigation.   J.A. 318.

10

Garnes forwarded Patronis's message to a friend, adding a message of her own in which she wrote "[d]uh" to describe her reaction to Patronis's announcement of the investigation.   J.A. 318–19.

As a result of the investigation, Patronis was arrested in January 2011, and charged with health care fraud conspiracy.   J.A. 563, 64. The grand jury investigation did not conclude, however, with Patronis's arrest.   J.A. 563.   In January 2011, investigators interviewed Marible and Jackson.   J.A. 563–64.   Later, in February 2011, investigators scheduled a meeting with Garnes, explaining that they wanted to speak with her about her relationship with Patronis as well as "generally about her own Medicaid billing."   J.A. 567.

During the interview, investigators discussed Garnes's billing practices and her various "supervisor" relationships.   J.A. 156, 566–75. Regarding her relationship with Marible, Garnes admitted that Marible submitted claims to her and that she, in turn, billed Medicaid using her provider numbers.   J.A. 158.   Garnes claimed, however, that Marible was provisionally licensed and provided services to Medicaid patients under her supervision.   J.A. 157, 568.   Despite claiming that Marible

11

was licensed, Garnes admitted that she knew Marible had failed the state exam several times and acknowledged that she never verified Marible's credentials.   J.A. 157, 568.

As to her supervision of Marible, Garnes asserted that she filed the requisite documents with the LPC board, including the form establishing the supervision arrangement and the quarterly reports describing her supervision.   J.A. 158, 569.   Garnes claimed that she met with Marible on an "as-needed basis" to review Marible's notes and to discuss patients. J.A. 157, 569.   Garnes admitted that, in light of her supervision, she was concerned about the volume of claims provided by Marible.   J.A. 572, 804.

Investigators also asked Garnes whether she was submitting claims to Medicaid on behalf of any other individuals.   J.A. 160, 573. Garnes initially maintained that Marible was the only other person for whom she submitted claims and denied that there were any others.   J.A. 160, 573.   When investigators showed Garnes an email related to Jackson's billings through Charlotte's Insight, however, Garnes admitted that she also billed for claims submitted by Jackson using her

Medicaid provider numbers.   J.A. 160, 502, 574–75.   Regarding her

supervision of Jackson, Garnes admitted that she had not verified

Jackson's credentials and had, in fact, never met Jackson in person.

J.A. 161, 575.

4.   <u>Following a jury trial, Garnes is convicted of conspiracy to
     commit health care fraud, obstruction of an official proceeding,
     and making false statements in connection with payments for
     health care services</u>.

The Grand Jury for the Western District of North Carolina charged

Garnes in a superseding bill of indictment with one count of conspiracy

to commit health care fraud, in violation of 18 U.S.C. § 1349; one count of

obstruction of an official proceeding, in violation of 18 U.S.C.

§ 1512(c)(2); and ten counts of making a false statement related to a

health care benefit program, in violation of 18 U.S.C. § 1035.   J.A. 11–

21.   Garnes proceeded to trial before a jury, the Honorable Frank D.

Whitney presiding.   J.A. 24–1002.

During its case in chief, the Government presented testimony from

individuals familiar with Medicaid or who were involved in the

investigation of Garnes and her coconspirators' billing practices.   J.A.

62–186, 235–754.   In addition, several parents of children covered by

13

claims submitted by Garnes testified that their children had never received outpatient behavioral health services and had never met Garnes, Marible, or Jackson.    J.A. 187–88, 197–99, 203–04, 219–20, 221–23, 233–34, 520–35, 539–45, 593–613, 616–17.    The Government also introduced volumes of emails, claims data, and patient files depicting how the fraudulent billing scheme operated and demonstrating that the claims were fraudulent.    J.A. 130–86, 235–66.

At the close of the Government's evidence, Garnes moved, pursuant to Rule 29 of the Federal Rules of Criminal Procedure, to dismiss all counts for insufficient evidence.    J.A. 741–49.    Although Garnes argued with respect to the obstruction charge that she was not under investigation at the time the crime allegedly occurred, she declined the district court's invitation to argue in support of her motion as to the health care fraud conspiracy or false statement counts.    J.A. 741, 746, 748.    The court rejected Garnes's argument regarding the obstruction count, concluding that there was no requirement that Garnes must have been a target of the investigation at the time of the obstruction.    J.A. 748.    The court also denied Garnes's motion as to the remaining counts,

14

finding that there was sufficient evidence that Garnes knowingly entered into a conspiracy to commit health care fraud and that the defendant knowingly and willfully made false and fictitious statements to a health benefit program in connection with each of the specified transactions.   J.A. 748–49.

After the Government rested, Garnes elected to testify in her defense.   J.A. 753–884.   During her testimony, Garnes admitted, contrary to her statement to investigators, that she did not submit any materials regarding her supervision of Marible to the LPC board.   J.A. 764, 767, 780, 839.   Garnes also admitted that she never met Jackson, despite allowing her to "bill through [her] number."   J.A. 784. Although Garnes admitted that it was her responsibility to ensure adequate supervision of Marible and Jackson, she claimed that she "neglected" to do so.   J.A. 853.   Garnes denied agreeing to bill services on behalf of Marible that were not performed.   J.A. 794.   When confronted with the numerous emails she received containing claims Marible submitted in excess of eighteen hours per day, Garnes maintained that she had "ignore[d]" any such emails.   J.A. 867–68.

15

At one point during Garnes's cross examination, the Government asked Garnes whether she had been fired from a prior job for "failure to complete supervision notes and required documentation."   J.A. 861. Garnes denied the Government's characterization and stated that she was fired after complaining that the owner's girlfriend had used her Medicaid billing number.   J.A. 861.   In an attempt to rebut Garnes's explanation, the Government asked if the letter Garnes claimed to have sent was, in fact, related to an affair she was having with the co-owner of the business.   J.A. 861.

Defense counsel objected to the line of questioning, complaining that the Government was seeking to elicit inadmissible "prior bad acts evidence" in violation of Rule 404(b).   J.A. 861–62.   In response, the district court explained that, because the questions arose during cross-examination, there was no need for a Rule 404(b) notice for this issue, which the court characterized as "whether [Garnes] was terminated or not for failing to maintain proper records."   J.A. 862. Defense counsel did not dispute the court's statement of the law or its characterization of the issue, but instead, simply responded "okay."

16

J.A. 862.   The Government then repeated its question about the timing of Garnes's complaint relative to her romantic relationship with the co-owner.   J.A. 863.   When Garnes continued to deny the timing, the Government stated that it was "happy to move on."   J.A. 863.

At the close of evidence, Garnes renewed her motion to dismiss, which the district court denied.   J.A. 888.   As part of its jury instructions, the court informed the jury that it must conclude beyond a reasonable doubt that Garnes acted knowingly and willfully and that evidence that Garnes acted "because of ignorance, mistake, or accident" was insufficient.   J.A. 903.   The court also explained that "[a] showing of negligence is not sufficient to support a finding of willfulness or knowledge."   J.A. 904.   Finally, the court provided a willful blindness instruction, explaining that the jury could infer the requisite intent if it concluded that Garnes "deliberately closed her eyes to what would otherwise have been obvious to her."   J.A. 903.

During closing argument, defense counsel argued that Garnes did not knowingly join the conspiracy but instead characterized her involvement as the product of "negligence" and "carelessness."   J.A.

17

912–38.   In response, the Government maintained that the evidence,

including the billing records and emails sent to and from Garnes, showed

that Garnes was not being truthful about her involvement and

contended that Garnes, in fact, "knew that it was fraud."   J.A. 897–911,

938–71.   Following deliberations, the jury found Garnes guilty on all

counts.   J.A. 995–96.

5.   <u>The district court sentences Garnes to a within-guidelines
     sentence of sixty months in prison and orders her to pay
     $792,814.52 in restitution to Medicaid.</u>

In preparation for sentencing, the probation officer prepared a

presentence investigation report, calculating an advisory guidelines

range of fifty-one to sixty-three months and recommending that the

district court order Garnes to pay $792,814.52 in restitution to Medicaid.

J.A. 1106–07.   In response, Garnes submitted a series of objections,

including a challenge to the restitution amount.   J.A. 1110.

Specifically, Garnes contended that she should not be held responsible

for claims Hampton-Sowell submitted on Marible's behalf.   J.A. 1110.

In response, the Government argued that the amounts billed by

Hampton-Sowell were reasonably foreseeable to Garnes during the

18

course of the conspiracy because Garnes suggested the billing arrangement between Marible and Hampton-Sowell and continued to bill for Marible's claims during the same time period under a joint supervision arrangement.   Supp. J.A. 2–3.   The Government also submitted a series of emails showing that Garnes and Hampton-Sowell regularly corresponded about Hampton-Sowell's billing on behalf of Marible.   Supp. J.A. 9–17.

At sentencing, the district court overruled Garnes's objections and adopted the presentence report, including the recommended guidelines range and restitution amount.   J.A. 1032.   In overruling Garnes's restitution objection, the court found that Garnes and Hampton-Sowell were friends, that Garnes aided Hampton-Sowell in the improper submission of fraudulent claims to Medicaid under her provider number, and that it was, therefore, "reasonably foreseeable . . . that [Garnes] would know about claims submitted by others within the conspiracy, not merely the ones submitted under her provider number."   J.A. 1011. After discussing the relevant sentencing factors, the district court

19

sentenced Garnes to a within-guidelines sentence of sixty months in
prison.   J.A. 1071.

## SUMMARY OF THE ARGUMENT

Because none of Garnes's claims have merit, the judgment of the
district court should be affirmed.   First, in support of her challenge to
the Government's limited questioning on cross-examination about one of
Garnes's prior romantic relationships, Garnes misconstrues the
objection below, overlooks the broader context of the questions, and fails
to demonstrate that the error impacted the outcome of the trial.   When
viewed in context, the Government's questions were part of its follow-up
to Garnes's explanation for her prior termination.   As such, the
questions were reasonably related to a relevant issue bearing on
Garnes's character for truthfulness.   Regardless, even assuming for the
sake of argument that the questions were improper, considered in the
context of the broader cross-examination, and in light of the
overwhelming evidence of Garnes's guilt, Garnes is unable to show that
any error impacted the jury's verdict.

20

Second, in support of her sufficiency of the evidence challenges, Garnes recycles many of the same arguments that the jury rejected when it found her guilty of all counts.   Garnes's primary argument is that she acted negligently or carelessly and, therefore, lacked the requisite intent to support her conspiracy and false statement convictions.   Garnes's argument overlooks direct evidence, including her own admissions, that she knowingly caused the submission of claims to Medicaid in which she falsely represented that she was the attending provider for services she did not perform.   This evidence alone, coupled with Garnes's division of the proceeds with her coconspirators, is sufficient to support her conspiracy and false statement convictions.   Moreover, Garnes fails to confront the overwhelming circumstantial evidence—including emails, payment data, remittance statements, and patient files—showing that she was fully aware that the claims she submitted on behalf of Marible and Jackson were completely fabricated.

As for Garnes's challenge to the obstruction conviction, her argument that she was unaware of the scope of the grand jury investigation and that her lies nevertheless did not impact that

21

investigation are belied by the record.    Prior to the interview, investigators told Garnes that they were looking into her billing practices, as well as investigating Patronis.    And, by attempting to legitimize the claims Patronis submitted on Garnes's behalf, Garnes's lies not only minimized her own culpability but also represented an attempt to exonerate Patronis.

Finally, Garnes's claim that she should not be required to pay restitution for amounts fraudulently billed by her coconspirator is contrary to the law and, even if it were not, is undermined the facts.    A defendant convicted of a conspiracy offense is responsible for all losses associated with the offense, not just for losses related to the defendant's individual conduct.    Accordingly, Garnes's argument that the amounts billed by her coconspirator were not reasonably foreseeable to her misses the point.    Even if Garnes were right on the law, however, the record shows that she suggested the billing arrangement that led to the false claims and regularly corresponded with her coconspirator about those claims.    Therefore, under either standard, Garnes's challenge to the restitution order fails.

# ARGUMENT

I.   **The district court did not plainly err during the cross-examination of Garnes by allowing the Government to ask limited follow-up questions about a past romantic relationship to rebut Garnes's characterization of her prior termination.**

## A.   Standard of Review

Ordinarily this Court reviews a district court's evidentiary rulings at trial for an abuse of discretion and will not reverse unless the rulings are arbitrary or irrational.   *United States v. Day*, 700 F.3d 713, 727–28 (4th Cir. 2012).   "To preserve an argument on appeal," however, "the defendant must object on the same basis below as he contends is error on appeal."   *United States v. Zayyad*, 741 F.3d 452, 459 (4th Cir. 2014). Where a defendant objects to the admission of evidence "on one basis at trial and a different basis on appeal," this Court's review is for plain error only.   *United States v. Pratt*, 239 F.3d 640, 644 (4th Cir. 2001) (citing *United States v. Wilson*, 973 F.2d 577, 580 (7th Cir. 1992)).

Under plain error review, the defendant must show (1) there was error, (2) the error was plain, and (3) the error affected the defendant's substantial rights, meaning that it affected the outcome of the

23

proceedings.   *United States v. Olano*, 507 U.S. 725, 731–32 (1993).

Even then, this Court will only correct the error if it seriously affects the

fairness, integrity or public reputation of judicial proceedings.   *Id.* at

732.

Here, Garnes objected under Rule 404(b) to the Government's cross

examination regarding "whether [Garnes] was terminated or not for

failing to maintain proper records."   *See* J.A. 862.   On appeal, Garnes

concedes that Rule 404(b) was "perhaps not the most appropriate

reference" and argues that the Government's attempt to impeach Garnes

"through the allegation of her having an extramarital affair" was an

impermissible basis for cross examination and unfairly prejudicial.   Br.

of Appellant 8–10.   Garnes's objection at trial under a different

evidentiary rule and on a different basis altogether was insufficient to

preserve the issue she now presents on appeal.   Accordingly, Garnes

must satisfy the additional requirements of plain error review.

### B.    Discussion

Although a party may not introduce extrinsic evidence "to prove

specific instances of a witness's conduct in order to attack . . . the

24

witness's character for truthfulness," the rules of evidence permit a party

to inquire into specific instances of a witness's conduct on

cross-examination, as long as "they are probative of the character for

truthfulness or untruthfulness of the witness."   Fed. R. Evid. 608(b).

In applying this rule, the trial court has "wide discretion" to determine

the relevance and probative value of the specific instances of conduct and

to decide to what extent to permit cross-examination about those specific

instances.   *United States v. Smith*, 451 F.3d 209, 223 (4th Cir. 2006).

Similarly, this Court is "highly deferential" to a trial's court's assessment

of whether the probative value of a particular piece of evidence is

substantially outweighed by the risk of unfair prejudice and will not

reverse "except under the most extraordinary circumstances."   *United

States v. Hassan*, ___ F.3d ___ , 2014 WL 406768, at * 20 (4th Cir. 2014).

    A review of the record undermines Garnes's claim that the district

court erred during the Government's cross-examination.   The key issue

at trial was whether Garnes knowingly and willfully participated in the

submission of false claims to Medicaid.   As such, evidence that Garnes

had been fired for failure to maintain required documentation in a past

25

job was relevant and constituted a proper basis for cross-examination. When Garnes denied that she had been terminated over a documentation issue and asserted that the real reason for her firing was a letter she wrote complaining about a coworker, Garnes opened the door to follow-up questions testing her alternative explanation. Accordingly, the district court acted within its "considerable discretion" by permitting limited questions inquiring into Garnes's romantic relationship with the co-owner of the business where she worked to challenge her explanation for the firing. *See United States v. Ambers*, 85 F.3d 173, 176 (4th Cir. 1996). On this record, there was no error, plain or otherwise.

Even if Garnes were able to show that the district court plainly erred by permitting the Government to follow-up on Garnes's explanation by asking about the affair, she is nevertheless unable to satisfy the remaining requirements of plain error review. The questions about which Garnes complains comprised only a brief part of the Government's lengthy cross-examination, during which Garnes admitted that she lied to investigators and had no explanation for the emails and files demonstrating that the claims were obviously false. Additionally,

26

when Garnes denied that the relationship amounted to an affair and reaffirmed that her firing was unrelated, the Government quickly "move[d] on," thereby limiting any prejudicial impact.   *See* J.A. 863.

Moreover, because the evidence of Garnes's guilt was overwhelming, as reflected by her own admissions, as well as the claims data, emails, and clinical files introduced at trial, Garnes cannot show that the outcome of the proceeding was impacted by the three questions the Government asked to follow-up on her explanation for the termination.   Accordingly, Garnes is unable to show that any error impacted her substantial rights or seriously impacted the fairness and integrity of judicial proceedings.   For these same reasons, even if this Court were to conclude that Garnes preserved the issue, any error is harmless.   *See United States v. Cloud*, 680 F3d 396, 401–02 (4th Cir. 2012) (applying harmless error review to alleged evidentiary rulings and concluding that any error was harmless given the "overwhelming evidence" of the defendant's guilt).

27

## II.    There was sufficient evidence from which a rational trier of fact could find each element of Garnes's various counts of conviction beyond a reasonable doubt.

### A.    Standard of Review

This Court reviews the denial of a defendant's Rule 29 motion for judgment of acquittal *de novo*.    *United States v. Zayyad*, 741 F.3d 452, 462 (4th Cir. 2014).    In so doing, this Court considers the evidence in the light most favorable to the government and "will sustain the verdict if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"    *United States v. Dinkins*, 691 F.3d 358, 387 (4th Cir. 2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original)).    As such, a defendant challenging the sufficiency of the evidence faces a "heavy burden" and will only prevail "in cases where the prosecution's failure is clear."    *Zayyad*, 741 F.3d at 462.    Moreover, in reviewing the denial of a Rule 29 motion, this Court will not reweigh the evidence or reassess the jury's determination of a witness's credibility.    *United States v. Roe*, 606 F.3d 180, 186 (4th Cir. 2010).

28

**B.    Discussion**

Garnes challenges the sufficiency of the evidence as to each count of conviction.   Contrary to Garnes's assertion, there was ample evidence from which a reasonable juror could find each element of Garnes's counts of conviction beyond a reasonable doubt.

1.    <u>There was overwhelming direct and circumstantial evidence from which a rational juror could conclude that Garnes knowingly and willfully joined and participated in the health care fraud conspiracy</u>.

A person commits health care fraud when she:

> knowingly and willfully executes, or attempts to execute, a scheme or artifice (1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program.

18 U.S.C. § 1347.   A conviction for conspiracy to commit health care fraud requires proof that (1) two or more persons entered into an agreement to commit health care fraud, (2) the defendant knew the unlawful purpose of the agreement, and (3) the defendant joined the agreement willfully and with the intent to further the unlawful purpose. *United States v. Njoku*, 737 F.3d 55, 63 (5th Cir. 2013); *United States v.*

29

*Osuji*, 413 Fed. App'x 603, 608 (4th Cir. 2011) (unpublished).   A

defendant need not, however, have full knowledge of all the objects and

purposes of the conspiracy.   *United States v. Burgos*, 94 F.3d 849, 858

(4th Cir. 1996) (en banc).   Instead, it is sufficient if the defendant knew

of the conspiracy's purpose and took some action indicating

participation.   *Id.*

   As this Court has long recognized, knowledge and participation in a

conspiracy is often proven through circumstantial evidence.   *United

States v. Tucker*, 376 F.3d 236, 238 (4th Cir. 2004) (citing *United States v.

Meredith*, 824 F.2d 1418, 1428 (4th Cir. 1987)).   Because direct evidence

of one's intent is rarely available, willful intent may be inferred from the

totality of the circumstances.   *United States v. Beverly*, 284 Fed. App'x

36, 40 (4th Cir. 2008) (citing *United States v. Davis*, 490 F.3d 541, 549

(6th Cir. 2007)).   Moreover, even when the defendant "asserts a lack of

guilty knowledge," the jury may nevertheless rely on a willful blindness

theory to satisfy the intent element where "the evidence supports an

inference of deliberate ignorance."   *Zayyad*, 741 F.3d at 463.

30

Garnes does not dispute that the evidence produced at trial established the existence of a conspiracy to commit health care fraud. Instead, Garnes's argument focuses exclusively on whether there was substantial evidence that she knowingly and willfully joined and participated in that conspiracy.    In support, Garnes contends that there was no evidence that she had "knowledge that either Marible or Jackson were anything other than provisionally licensed counselors," reviewed the client notes, or sanctioned the billing practices.    Garnes's argument overlooks key pieces of direct evidence and fails to credit the reasonable inferences a rational juror could draw from the overwhelming circumstantial evidence.

By her own admission, Garnes knowingly and willfully submitted claims to Medicaid on behalf of Marible and Jackson in which she falsely represented that she was the attending provider who performed the services.    Medicaid sent payment for those claims directly to Garnes, who, after taking a 30% cut, passed along the remainder to Marible and Jackson.    Moreover, the evidence established that, even if Marible and Jackson had been provisionally licensed, Garnes was nevertheless

31

prohibited from submitting claims on their behalf under a supervision arrangement because she was not a physician.   On this evidence alone, a rational juror could conclude beyond a reasonable doubt that Garnes knowingly and willfully joined and participated in the conspiracy.   Even assuming for the sake of argument that Garnes was unaware that the claims were fabricated, by submitting claims to Medicaid for services she did not provide, despite representing otherwise in the claims, Garnes knowingly and willfully joined the conspiracy.   Accordingly, Garnes's suggestion that the evidence was insufficient because there was no evidence that she knew the services were never provided misses the point.

Contrary to Garnes's characterization, however, there was overwhelming circumstantial evidence to support an inference that Garnes was fully aware that many of Marible and Jackson's claims were bogus.   Garnes received emails containing facially invalid claims data, including claims for services in excess of twenty-four hours per day. Although Garnes claimed that she ignored these emails, the jury could reasonably conclude that Garnes's testimony was not credible, especially

32

where other evidence showed that Garnes regularly corresponded with her coconspirators about the billing activities.   In fact, in one of the emails introduced at trial, Garnes appeared to coach Marible as to how best to falsify her records by "mix[ing] up the dates on the termination forms."   J.A. 665.   In other emails, Garnes commented specifically on the high volume of claims submitted by Marible.   *See* J.A. 514–15.   By her own admission, Garnes was concerned about the volume of claims that Marible passed along to Garnes for submission.

In addition to the compelling email evidence, the record shows that all of the proceeds from the fraudulent claims were deposited directly into Garnes's bank account and that Garnes herself received all of the remittance statements from Medicaid.   Either one of these pieces of evidence provides strong circumstantial evidence that Garnes was aware of the unbelievable volume of claims she was submitting on behalf of Marible and Jackson.   Such an inference is bolstered by the fact that the Marible and Jackson claims comprised 90% of Garnes's total billing and that Medicaid billing was Garnes's largest source of income.   On this record, although not required to support a conviction, there is

33

overwhelming evidence from which a reasonable juror could conclude that Garnes was fully aware of and actively participated in the entire scope of the health care fraud conspiracy, including the submission of claims for services that were never provided.

Finally, at a minimum, there was substantial evidence of intent under a willful blindness theory. Even if Garnes had ignored all of the emails, failed to review any of Marible and Jackson's clinical notes, and did not appreciate the significance of the volume of the reimbursements from Medicaid, a rational juror could conclude that she was willfully blind to the conspiracy by "closing [her] eyes to avoid knowing what was taking place around [her.]" *See United States v. McIver,* 470 F.3d 550, 563–64 (4th Cir. 2006) (quotations omitted). Accordingly, the jury's verdict finding Garnes guilty of conspiracy to commit health care fraud should be affirmed.

2. <u>By submitting claims for services she did not provide while indicating that she was the provider, Garnes knowingly submitted, or at least aided and abetted in the submission of, false statements to Medicaid.</u>

To support a conviction for false statements relating to a health care matter, the government must prove that the defendant "knowingly

34

and willfully . . . ma[de] any materially false, fictitious, or fraudulent statements or representations . . . in connection with the delivery of or payment for health care benefits . . . or services." 18 U.S.C. § 1035(a). In such cases, "[t]he specific intent to defraud may be inferred from the totality of the circumstances, and need not be proven by direct evidence." *United States v. McLean*, 715 F.3d 129, 140 (4th Cir. 2013). To convict a defendant for aiding and abetting an offense, the Government is not required to prove that the defendant participated in "every stage of an illegal venture," only that the defendant "knowingly associated himself with and participated in the criminal venture." *Burgos*, 94 F.3d at 873.

As with the conspiracy offense, Garnes only challenges the intent element of her false statement convictions. Conceding that false statements were made in connection with the delivery or payment of health care benefits, Garnes contends that there was insufficient evidence to show that she shared in the criminal intent or had knowledge of the result of the offense. Rather than acting knowingly and willfully, Garnes asserts that her participation in the submission of the false

35

claims was the result of "careless and negligent" conduct on her behalf. Br. of Appellant 17.

Similar to the conspiracy conviction, Garnes's false statement convictions did not depend on proof that she knew the claims were for services that were never provided. Instead, evidence that Garnes knowingly and willfully caused the submission of claims to Medicaid in which she falsely represented that she was the attending clinician for services she did not perform was sufficient to support her convictions. In light of Garnes's own admission that she submitted claims on behalf of Marible and Jackson indicating that she was the attending provider, the evidence of Garnes's intent to submit a false statement to Medicaid was overwhelming and conclusive.

By arguing that her participation in the submission of false claims was the product of carelessness and negligence, Garnes attempts to resurrect arguments that the jury rejected at trial. During her testimony at trial and throughout closing argument, Garnes maintained that, rather than a full and witting participant in the submission of false statements, she was the victim of Marible, Jackson, and Patronis's

36

deceit.   Consistent with Garnes's theory, the district court properly instructed the jury that acts based on ignorance, mistake, or negligence were insufficient to satisfy the intent element.   *See* J.A. 903.   In finding Garnes guilty of all ten false statement counts, it is apparent that the jury found Garnes's testimony to be unbelievable and instead credited the reasonable inferences derived from the compelling circumstantial evidence introduced by the Government.   Because "it is the jury's province to weigh the credibility of witnesses," this Court should affirm the jury's verdict.   *See United States v. Dinkins*, 691 F.3d 358, 387 (4th Cir. 2012).[2]

3.    <u>In support of Garnes's conviction for obstruction of an official proceeding, there was ample evidence establishing that Garnes was aware of the grand jury investigation and lied to obstruct, influence, or impede that investigation</u>.

A defendant is guilty of obstruction if she "corruptly . . . obstructs, influences, or impedes any official proceeding, or attempts to do so."   18

_____

[2]Garnes's reliance on the Supreme Court's 1933 decision in *United States v. Murdock*, 290 U.S. 389 (1933) is misplaced.   In *Murdock*, the Court found that the trial court's instruction on willfulness was inadequate.   *Id.* at 396.   Here, however, the district court properly instructed the jury that proof of the requisite intent required more than showing Garnes acted "because of ignorance, mistake or accident" and that "[a] showing of negligence is not sufficient."   J.A. 903–04.

37

U.S.C. § 1512(c)(2).   As this Court has recognized, in order to convict a defendant of obstruction, "the government need not demonstrate that justice was in fact obstructed."   *United States v. Brooks*, 111 F.3d 365, 372 (4th Cir. 1997).   Instead, to sustain a conviction for obstruction, the government must prove that the defendant had knowledge or notice of an official proceeding and acted with intent to obstruct, influence, or impede that proceeding.   *See United States v. Brooks*, 111 F.3d 365, 372 (4th Cir. 1997) (interpreting the similarly worded 18 U.S.C. § 1503); *see also United States v. Reich*, 479 F.3d 179, 186 (2d Cir. 2007) (holding that § 1512(c)(2) requires proof that the defendant's conduct was related in "time, causation, or logic" to the official proceeding).   By statute, a grand jury investigation is an "official proceeding."   18 U.S.C. § 1515(a)(1).

Here, there was ample evidence to support each essential element of Garnes's conviction for obstruction.   By her own admission, Garnes lied to investigators about the submission of quarterly reports to the LPC board related to her supervision of Marible and provided misleading statements about whether she had submitted claims to Medicaid on behalf of individuals other than Marible.   At the time Garnes made the

38

false and misleading statements, she was aware of the existence of the federal investigation based on the fact that Patronis disclosed the investigation to Garnes via email and because investigators explained the purpose of the meeting before speaking with Garnes. On this record, a rational juror could reasonably conclude that Garnes possessed the requisite intent to obstruct, influence, or impede the grand jury proceeding by lying about her supervision to bolster her explanation for the fraudulent billing.

In support of her sufficiency of the evidence challenge, Garnes does not dispute that she lied or that she knew there was an impending judicial proceeding, but instead argues that the Government failed to demonstrate how her lies would have impacted that proceeding. Specifically, Garnes contends that her misstatements related to her own conduct and, therefore, would not have impacted "any pending proceeding against either Patronis or Marible." Br. of Appellant 15. Garnes's argument mischaracterizes both the scope of the grand jury investigation and the impact of her false and misleading statements.

39

The evidence at trial showed that, although the grand jury investigation began as an inquiry into Patronis, by the time officers met with Garnes, the investigation had broadened.   As such, when investigators met with Garnes, they explained to her that, in addition to discussing Patronis, they also intended to ask her "generally about her own Medicaid billing."   J.A. 567.   Moreover, Garnes's lies about her alleged "supervisor" relationships with Marible and Jackson did not just minimize her own culpability but also suggested that the claims ultimately entered by Patronis were legitimate.   Accordingly, even if Garnes mistakenly believed, contrary to the evidence, that the investigation was only about Patronis, her misstatements could nevertheless have impacted such an investigation by legitimizing the claims Patronis entered.   Accordingly, Garnes's arguments are unavailing and should be rejected.

40

**III.  The district court acted within its discretion by ordering Garnes to pay restitution that included amounts related to fraudulent claims submitted by her co-conspirator.**

**A.    Standard of Review**

This Court reviews a district court's restitution order for an abuse of discretion. *United States v. Leftwich*, 628 F.3d 665, 667 (4th Cir. 2010).

**B.    Discussion**

The Mandatory Victims Restitution Act ("MVRA") requires defendants to "make restitution to the victim of the *offense*."  18 U.S.C. § 3663A(a)(1) (emphasis added).   In light of this language, under the MVRA, the focus of the restitution inquiry is on the offense of conviction, rather than the defendant's relevant conduct.   *United States v. Newsome*, 322 F.3d 328, 341 (4th Cir. 2003).   Accordingly, in cases involving a conspiracy conviction, each member of the conspiracy is responsible for any losses caused by the conspiracy offense, regardless of whether or not those losses are linked to the defendant's individual participation.   *Id.*; *see also United States v. Hughes*, 484 Fed. App'x 766, 768 (4th Cir. 2012) (holding that a defendant convicted of mail fraud was

41

responsible for paying restitution for all losses caused by the conspiracy, "not merely for the loss occasioned by her overt acts").

In light of these principles, Garnes's argument that the district court erred by ordering her to pay restitution based on claims submitted by her co-conspirator Hampton-Sowell is unavailing.   Because Garnes was convicted of conspiracy to commit health care fraud, under the MVRA, she is responsible for restitution for any losses to victims that resulted from that offense.   Garnes's contention that she should not be responsible for false claims submitted by Hampton-Sowell because those amounts were not reasonably foreseeable to her is, therefore, beside the point.

Even if restitution was limited, as Garnes suggests, to the losses within the conspiracy that were reasonably foreseeable to Garnes, the district court did not clearly err in holding that the amounts billed by Hampton-Sowell were properly attributable to Garnes as well.   The evidence presented at trial and during the sentencing hearing established that the billing arrangement between Hampton-Sowell and Marible was Garnes's suggestion and that Hampton-Sowell and Garnes

42

regularly corresponded about the billing.    Under these circumstances, the court properly concluded, by a preponderance of the evidence, that the claims submitted by Hampton-Sowell were reasonably foreseeable to Garnes within the scope of the conspiracy.    Accordingly, even under the framework suggested by Garnes, the restitution order should be affirmed.

## CONCLUSION

For the foregoing reasons, the Government requests that this Court affirm the district court's judgment.

## REQUEST FOR DECISION ON THE BRIEFS WITHOUT ORAL ARGUMENT

The United States does not believe that oral argument will assist the Court in any material way and requests that this appeal be decided on the briefs.

43

Respectfully submitted, this the 7th day of March, 2014.

<div style="margin-left: 40%;">

ANNE M. TOMPKINS
UNITED STATES ATTORNEY
s/ William M. Miller
William M. Miller
NC Bar Number # 36946
Assistant United States Attorney
227 West Trade Street
Carillon Building, Suite 1650
Charlotte, North Carolina 28202
Telephone: (704) 344-6222
Fax: (704) 344-6229
E-mail: William.Miller@usdoj.gov

</div>

## <u>CERTIFICATION OF COMPLIANCE</u>

1.    This Brief has been prepared using (select and complete only one):

__x__    Fourteen point, proportionally spaced, serif typeface (such as CG Times or Times New Roman, NOT sans serif typeface such as Arial).   Specify software name and version, typeface name, and point size below (for example, WordPerfect 8, CG Times, 14 point): <u>Microsoft Word, Century Schoolbook, 14 point</u>

_____ Twelve point, monospaced typeface (such as Courier or Courier New).   Specify software name and version, typeface name, and point size below (for example, WordPerfect 8, Courier 12 point):

2.    EXCLUSIVE of the corporate disclosure statement; table of contents; table of citations; statement with respect to oral argument; any addendum containing statutes, rules, or regulations, and the certificate of service, the brief contains (select and complete only one):

3._____    Pages (give specific number of pages; may not exceed 30 pages for opening or answering brief or 15 pages for reply brief); OR

_7799_ Words (give specific number of words; may not exceed 14,000 words for opening or answering brief or 7,000 for reply brief); OR

_____ Lines of Monospaced Type (give specific number of lines; may not exceed 1,300 lines for opening or answering brief or 650 for reply brief; may be used ONLY for briefs prepared in monospaced type such as Courier or Courier New).

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.   If the Court so directs, I will provide an electronic version of the brief and/or a copy of the word or line print-out.

s/ William M. Miller
Assistant United States Attorney
USAO Charlotte, NC

## <u>CERTIFICATE OF SERVICE</u>

I certify that I have this day served a copy of the above upon Defendant herein by serving his attorney of record, William D. Auman, through electronic case filing.

This the 7th day of March, 2014.

s/ William M. Miller
Assistant United States Attorney
USAO Charlotte, NC